In re Estate of Johanna Klein.

John E. Klein, proponent-appellant, v. Helen Castorf et al., contestants-appellees.

No. 47617.

(Reported in 42 N.W.2d 593)

1104

May 2, 1950.

Rehearing Denied October 23, 1950.

Campbell & Campbell, of Newton, for proponent-appellant, and M. J. Carey, of Newton, for Enid Klein, devisee.

Bray, Carson & McCoy, of Oskaloosa, and Cross & Hamill, of Newton, for contestants-appellees.

Garfield, J.—Testatrix, Johanna Klein, died July 27, 1948, at the age of eighty-eight, survived by her husband, Abe, son John, daughter Helen Castorf, grandson Earl Klein whose father (Carl) died in April 1943 and grandsons Carl and Merlin Rykhoek whose mother (Marie) died January 1, 1945. Testatrix left three farms of a total value of about $120,000 and personalty of undisclosed amount.

The will, made December 28, 1945, gives a life estate in all property to the husband and subject thereto a farm of 177 acres to the son John, a 140-acre farm to the grandsons Carl and Merlin Rykhoek, the home 160 acres to the grandson Earl Klein

and $2000 to the daughter Helen Castorf. The son John is nominated executor.

The codicil, executed March 26, 1947, makes these changes in the will: The legacy to the daughter Helen is reduced to a life estate in $2000 with remainder to the son and daughter of the son John. The 140-acre farm is left to the daughter-in-law Enid Klein (widow of the son Carl) subject to a charge of $10,500 payable by her in three equal shares to the grandsons Carl and Merlin Rykhoek and Carl E. Klein, son of John Klein. The husband, Abe, is given the right to use or dispose of the moneys and credits, with seventy-five per cent of any remainder at his death to the son John and twenty-five per cent to the grandson Earl Klein.

The son John offered the will and codicil for probate. Objections were filed by the daughter Helen Castorf and grandsons Carl and Merlin Rykhoek, charging improper execution of the will and codicil and mental incapacity and undue influence. The jury returned a verdict for contestants and its answers to interrogatories state neither the will nor codicil was executed according to law and testatrix lacked testamentary capacity and was under undue influence when both will and codicil were made. Judgment was entered on the verdict denying probate of the will and codicil. From the judgment proponent has appealed.

I. Proponent contends it was established as a matter of law that both will and codicil were duly executed. Contestants say the issue was properly submitted to the jury.

The witnesses to the will are Mr. and Mrs. Vander Pol, farm neighbors of testatrix. Mr. Vander Pol's brother married a sister of Ben Rykhoek, father of contestants Carl and Merlin Rykhoek. In the forenoon of December 28, 1945, Enid Klein (widow of the son Carl), who lived with testatrix and her husband, went to the Vander Pol home and asked them whether they would come and witness Johanna's will. The Vander Pols went to the Klein home that evening. Mr. and Mrs. Klein and Enid were there.

Mr. Vander Pol testifies: "Mr. Klein went in the other room and got the will and put it on the table where Mrs. Klein was and she signed it and she gave me the pen and I signed it.

Then I gave the pen to my wife and she signed it. Both my wife and I were present when Johanna signed."

Before testatrix signed the will she was uncertain whether to sign "Mrs. Abe Klein" or "Johanna Klein." Mr. Klein then called Enid into the room, who told her to sign the way her name appeared in the will. Enid also showed testatrix the line on which to sign. Vander Pol also says "Mrs. Klein never said a word about what she was signing. I wouldn't have known what she had signed if Enid hadn't told us she wanted us to come down and witness a will."

Mrs. Vander Pol's testimony is substantially the same as her husband's. Both seem quite clear as to the circumstances of the signing. Mrs. Vander Pol says testatrix wrote the date in the will.

Witnesses to the codicil are Mr. and Mrs. Knopf, tenants on one of testatrix' farms. Mrs. Knopf formerly taught school. The daughter-in-law Enid asked Mrs. Knopf by telephone if she and her husband would come over to the Klein home. Two or three weeks earlier Abe had told Mr. Knopf "Grandma" was going to change her will. Mr. and Mrs. Knopf went to the Klein home that afternoon. Mr. and Mrs. Klein were alone in a small room. The codicil was on the table where Mrs. Klein was sitting. She signed the paper, then handed Mr. Knopf the pen, he signed, handed the pen to his wife and she signed. Both Mr. and Mrs. Knopf testify to these matters and that they do not recall any statement by Mrs. Klein regarding the will or codicil.

On August 10, 1948, after testatrix died, Mr. Knopf told one of contestants' attorneys and Ben Rykhoek he knew nothing about what was in the paper they signed, that Mr. Klein (rather than Enid) asked them by phone to come over and "Mrs. Klein didn't say anything while we were there. I don't remember that Mr. or Mrs. Klein signed while we were there. They might have." The attorney wrote out this statement but Mr. Knopf refused to sign it because he did not want trouble with the Kleins although he then admitted it was true. Later Knopf talked with his wife, with Mr. Klein, and with proponent's attorney and testifies the special reason he now remembers he saw Mrs. Klein sign the codicil is that was the first time he ever saw her write her name.

The will and codicil were prepared by Mr. Campbell, an attorney in Newton, a few days before the date of each instrument. The attestation clause to the will signed by the Vander Pols reads: "We hereby certify that Johanna Klein, of Jasper County, Iowa, did in our presence in said county on December 28, 1945, sign the foregoing instrument and declare it to be her last will and testament and we, at her request and in her presence and in the presence of each other, do hereunto subscribe our names as witnesses thereto." The attestation clause to the codicil signed by the Knopfs is the same except the date is March 26, 1947, and the instrument referred to is "her codicil to her last will and testament." It is to be inferred none of the four witnesses read the attestation clause they signed.

Section 633.7, Code, 1946, requires that a will "be in writing, signed by the testator * * * and witnessed by two competent persons." Witnesses to the will must subscribe to it. In re Will of Boyeus, 23 Iowa 354. Compliance with this statute is all that is necessary for proper execution. Scott v. Hawk (Ladd, J.), 107 Iowa 723, 77 N.W. 467, 70 Am. St. Rep. 228; In re Estate of Bybee, 179 Iowa 1089, 1092, 160 N.W. 900; In re Will of Droge, 216 Iowa 331, 334, 249 N.W. 209; 68 C.J., Wills, section 273, page 649.

The statute contemplates the will must be signed by the maker in the presence of the subscribing witnesses or he must adopt or acknowledge his signature to them and it must be signed by the witnesses at the request of the maker. In re Will of Droge, supra; In re Estate of Harter, 229 Iowa 238, 247, 294 N.W. 357.

No formal request by the maker to the witnesses to act as such is necessary. The request may be implied from his acts or conduct or from surrounding circumstances. See In re Estate of Mathews, 234 Iowa 188, 194, 12 N.W.2d 162, 165, and citations; In re Estate of Burcham, 211 Iowa 1395, 1399, 235 N.W. 764; Mulligan v. Leonard, 46 Iowa 692, 695; In re Cosgrove's Estate, 290 Mich. 258, 287 N.W. 456, 125 A. L. R. 410, 413, and annotation 414, 420, 423, 429: "There is considerable authority * * * that a request may be implied from the testator's silent acquiescence in, or failure to object to, the attestation by the witnesses." (Page 429 of 125 A. L. R.); 68 C.J., Wills, section

337; 57 Am. Jur., Wills, section 289: "The request * * * may be conveyed to the witness by signs, gestures, or other conduct."

It is not necessary that testator declare to the witnesses the character and purpose of the instrument, which amounts to what is called "publication." In re Will of Hulse, 52 Iowa 662, 664, 3 N.W. 734, 736; Scott v. Hawk, supra, 107 Iowa 723, 725, 77 N.W. 467, 70 Am. St. Rep. 228; Nixon v. Snellbaker, 155 Iowa 390, 393, 136 N.W. 223; In re Estate of Bybee, supra, 179 Iowa 1089, 1093, 160 N.W. 900; In re Estate of Harter, supra, 229 Iowa 238, 244, 294 N.W. 357; In re Estate of Mathews, supra, 234 Iowa 188, 193, 12 N.W.2d 162, 164; 57 Am. Jur., Wills, sections 284, 300; 68 C.J., Wills, section 343.

The statement in In re Estate of Huston, 238 Iowa 297, 299, 27 N.W.2d 26, 28, "He [proponent] assumes the burden of proving compliance with certain technical, formal rules requiring signing, witnessing, and publishing" should not have included "publishing." It is true, as contestants assert, that proponent has the burden of proving signing and witnessing of the instruments. Hull v. Hull, 117 Iowa 738, 743, 89 N.W. 979; Beebe v. McFaul, 125 Iowa 514, 516, 101 N.W. 267; In re Estate of Olson, 239 Iowa 1149, 1155, 34 N.W.2d 207, 210; 68 C.J., Wills, section 748; 57 Am. Jur., Wills, section 854.

We think proper execution of the will and codicil appears as a matter of law.

As stated, both witnesses to the will say testatrix signed the instrument in their presence and then handed the pen to Mr. Vander Pol who signed and in turn handed the pen to his wife who also signed. Both witnesses signed in testatrix' presence without objection from her. Under the authorities above-cited this evidence establishes that the witnesses signed at testatrix' request. (See also 68 C.J., Wills, section 339.) There is no room for a contrary finding. Upon like reasoning the codicil was also signed under similar circumstances by the witnesses thereto at Mrs. Klein's request.

Testatrix was not required to inform the witnesses of the character and purpose of either instrument. (See authorities previously cited.) Nor was it necessary that either will or codicil be read to or by testatrix in their presence. In re Estate of Bybee, supra, 179 Iowa 1089, 1092, 160 N.W. 900; Smith v.

Ryan, 136 Iowa 335, 339, 112 N.W. 8; Scott v. Hawk, supra, 107 Iowa 723, 726, 77 N.W. 467, 70 Am. St. Rep. 228. If the instruments were signed and witnessed as required by law it is presumed testatrix knew their contents. In re Estate of Lewman, 239 Iowa 563, 566, 30 N.W.2d 737, 738; 57 Am. Jur., Wills, section 861.

Failure of the subscribing witnesses to read the attestation clause cannot be given greater effect than if such clause had been omitted. We have uniformly held an attestation clause is not required. In re Estate of Early, 234 Iowa 570, 573, 13 N.W.2d 328, 330, and citations; In re Estate of Mathews, 234 Iowa 188, 193, 12 N.W.2d 162, 164; In re Estate of Bybee, supra, 179 Iowa 1089, 1093, 160 N.W. 900. See also 57 Am. Jur., Wills, section 296.

That Mr. Knopf may have told contestants' attorney and Ben Rykhoek, "I don't remember that Mr. or Mrs. Klein signed while we were there. They might have", did not require submission to the jury of the issue of execution of the codicil. It is undisputed that testatrix and the witnesses signed the codicil and, we have held, at testatrix' implied request. It is therefore presumed to have been duly executed even if there had been no attestation certificate. In re Estate of Olson, supra, 239 Iowa 1149, 1154, 1155, 34 N.W.2d 207, 210; In re Estate of Repp, 241 Iowa 190, 196, 40 N.W.2d 607, 610, 611; annotation 76 A. L. R. 617, 622.

Knopf's prior uncertainty or failure of memory as to having seen testatrix sign is not sufficient to overcome this presumption. "It is a fundamental rule that the proof of the execution of a will does not depend upon the memory of the subscribing witnesses, or upon their recollection as to the particulars attending the execution of the will." 57 Am. Jur., Wills, section 906. See also 68 C.J., Wills, section 802.

In Leatherbee v. Leatherbee, 247 Mass. 138, 141 N.E. 669, one witness to the will was dead, the two witnesses who testified were unable to recollect anything about the execution of the will although each identified her own and testatrix' signatures, the fourth witness was the contestant who did not testify. There was no attestation clause but merely the word "witness." The trial court had denied probate. It was held there was no evi-

dence to overcome the presumption of regular execution which arose from proof of genuineness of the signatures and that a finding for proponent was required. We have pointed out that the Massachusetts statute is analogous to our section 633.7. In re Estate of Harter, 229 Iowa 238, 244, 294 N.W. 357.

In Rupp v. Jones, 289 Ill. 596, 124 N.E. 560, one witness to the will did not remember whether he saw testator sign the instrument. The other witness did not recollect whether testator's signature was on the paper when he (witness) signed and thought the attestation clause was not read over to him. To quote from the opinion (page 598 of 289 Ill., page 561 of 124 N.E.): "He also testified that he had forgotten at one time that he had ever signed the instrument but that after refreshing his recollection he remembered it." The court held there was a prima facie case of due execution which was "absolutely uncontradicted." The opinion states (page 600 of 289 Ill., page 562 of 124 N.E.): "It is not singular or unusual for attesting witnesses not to be able to remember all that occurred at the execution of the will or as to what they saw of the will or of the signature of the testator thereto."

Brelie v. Wilkie, 373 Ill. 409, 412, 26 N.E.2d 475, 476, holds a prima facie case of due execution is made where no defect appears on the face of the will and the signatures of testatrix and subscribing witnesses are genuine and "this prima facie case is not overcome by the mere fact that the subscribing witnesses testify they failed to notice whether the will was signed or not, and cannot remember whether they saw the signatures." See also In re Elkerton's Estate, 380 Ill. 394, 44 N.E.2d 148, where there was a discrepancy and some contradiction in testimony of one subscribing witness at a previous hearing. Rupp v. Jones and Brelie v. Wilkie, both supra, are there followed.

In Nixon v. Snellbaker, supra, 155 Iowa 390, 136 N.W. 223, both subscribing witnesses were able only to testify they signed the instrument and that testatrix' signature was genuine. To quote from the opinion (at page 391 of 155 Iowa, page 224 of 136 N.W.): "But beyond this neither witness had any recollection. They did not recollect signing the will themselves, nor did they recollect of testator's signing it." There was no attestation clause. We held the trial court was justified in finding the will

was properly executed. The Nixon case is cited with approval in In re Estate of Olson, supra, 239 Iowa 1149, 1152, 34 N.W.2d 207, and In re Estate of Repp, supra, 241 Iowa 190, 196, 40 N.W.2d 607, 611.

In the Olson case, supra, we say (at page 1155 of 239 Iowa, page 210 of 34 N.W.2d), "* * * every presumption will be indulged in favor of the due execution of a will." To like effect is 57 Am. Jur., Wills, section 866.

Our decision upon the question of execution also finds support in Scott v. Hawk, supra, 107 Iowa 723, 77 N.W. 467, 70 Am. St. Rep. 228; In re Estate of Bybee, supra, 179 Iowa 1089, 160 N.W. 900; In re Estate of Burcham, supra, 211 Iowa 1395, 235 N.W. 764; Betts v. Lonas, 84 U. S. App. D. C. 206, 172 F.2d 759.

II. We think the evidence of both mental incapacity and undue influence insufficient for submission to the jury. Contestants had the burden on these issues. In re Estate of Huston, supra, 238 Iowa 297, 299, 27 N.W.2d 26, 28; In re Estate of Heller, 233 Iowa 1356, 1364, 1365, 11 N.W.2d 586, 592.

Principal witnesses for contestants were the daughter Helen Castorf, herself a contestant, and Ben Rykhoek, father of the other contestants. Helen testifies she noticed a change in her mother about a year before the will was made, she was very forgetful, her hands very shaky, sight failing, she lost the sight of one eye, her eyes were glassy, her lower jaw hung down with her mouth open, when people would come she did not know them, Helen's father was "strongheaded," domineering and looked after her mother's business. Asked if testatrix appeared to have delusions, Helen answered "yes." Proponent's motion to strike the answer as a conclusion stated there was no opportunity to object. The motion was overruled.

Helen also says the daughter-in-law Enid told her about two months before her mother died (about fourteen months after the codicil was made) it was best for Helen not to see her mother because the mother told stories about Helen leading an immoral life. Helen further testifies Enid told her that her mother said, "Helen had six men running after her and had immoral relations with a minister. Ben Rykhoek had immoral relations with women." This was also two months before testatrix died. There is evidence these charges of immorality were untrue. Helen also

says Enid told her early in 1947 testatrix accused her, Enid, of being immoral.

Evidence of declarations by Enid was received over proponent's objections it was hearsay and inadmissible since there were several legatees, it was too remote and the questions were leading.

Basing her answer on the matters testified to by her Helen expresses the opinion her mother's mind was unsound át all times she saw her during the last five years.

On cross-examination Helen testifies her mother would forget where she had put her purse, failed to recognize Merlin Rykhoek and Florence Terpstra, a cousin in Texas who visited testatrix once a year. In the spring of 1948 (a year after the codicil was made) she did not recognize Helen's son-in-law—whether she knew him does not appear.

Ben Rykhoek's testimony is similar to Helen's. He says he noticed a change in testatrix around eight years ago, she was getting feeble, helpless and forgetful, she said herself she was forgetful, had a "starey" look, sometimes her lower jaw would droop, she did not always know him unless he would go up to her and speak—then she always knew him, in 1946 testatrix said Enid had given a minister one of testatrix' rugs and money stolen from testatrix, these charges were untrue although he could not say positively Enid had not given the minister a rug.

Ben Rykhoek further testifies that prior to 1945 testatrix always said the 177-acre farm would go to his wife Marie (who died January 1, 1945), the home 160 acres would go to Carl, who died in April 1943, the 140-acre farm to John and that Helen Castorf would get money. (Helen's husband died November 22, 1945, leaving her 270 acres valued at about $40,000.) Ben also says testatrix once told them her son John wanted the 177-acre farm and ten or fifteen years ago testatrix said, with a smile, that Enid had asked her if she was not going to give her and her boy more than the others because he had always stayed with them. This was received over the objection it was too remote.

Basing his answer on the matters detailed by him, Ben gives the opinion testatrix' mind was unsound at the times he saw her during her last four years.

Ben Rykhoek occupied the 177-acre farm from 1920 to March 1, 1948, when he vacated pursuant to written notice by

attorneys for the Kleins who apparently felt the rent was inadequate. There was also some unpaid rent.

Contestant Carl Rykhoek testifies he noticed a change in testatrix about six years before, she became very forgetful, her eyes looked glassy, she sat in a chair and stared at the floor with her lower jaw dropped, when he came in the house she would not know him unless he would go to her and speak, her talk was disconnected, her hands shaky, testatrix once lost her glasses and they were in her dress pocket where she had put them.

The other contestant, Merlin Rykhoek, says his grandfather was a strongheaded man, that after 1943 testatrix became very forgetful, had a "starey" look in her eyes, her talk was disconnected, she would not recognize him unless he would go to her and speak—then she would know him. (Helen had said testatrix failed to recognize Merlin.)

Carl Rykhoek's wife, who first knew testatrix in June 1946 (six months after the will was made), adds her testimony that she was very feeble, her hands very shaky, she had a glassy stare about her eyes and "didn't seem to remember."

Dr. Wright, the family physician, testifies that on May 28, 1948, Mrs. Klein had heart trouble, arteriosclerosis and was failing generally rather rapidly, she showed "the general mental changes characteristic of people of advanced years in that she probably was not as alert as one ordinarily expects a younger person to be. She was oriented, that is, she knew her people. She knew who I was, she knew her family." In answer to a very leading question, objected to for that reason, the doctor says practically everyone between eighty-five and eighty-eight shows some senile deterioration. On cross-examination Dr. Wright testifies he first noticed Mrs. Klein was less alert, at least he first mentioned it in his notes, on May 28, 1948. That seems also to have been his first observation she had heart trouble, arteriosclerosis and was failing.

Contestants called proponent's attorney as a witness who says he prepared the will and codicil in his office and does not remember that Mrs. Klein, her husband or Enid was there within a few days of either occasion. There is no evidence that before testatrix died the attorney had acted as such for proponent.

However, the husband had other business in the attorney's office from time to time.

Witnesses for proponent include over twenty acquaintances, many of long standing and most of them disinterested, who either express the opinion testatrix was of sound mind or say they observed nothing unusual about her. The two witnesses to the will and those to the codicil testify they noticed nothing glassy about her eyes, did not observe her lower jaw hang down or her hands shaking. The witnesses to the codicil say testatrix always knew them and they noticed nothing wrong with her mind at any time.

Florence Terpstra says Mrs. Klein always knew her and had an unusually good memory for one of her age. (Helen had said testatrix failed to recognize Florence.) A real estate broker says Mrs. Klein made the decision in January 1945 to sell a farm for over $13,000. The tenant who succeeded Ben Rykhoek on the 177-acre farm testifies that in the summer of 1947 Mrs. Klein fixed the amount of cash rent for the pasture.

There is no expert evidence of any mental incapacity. There is no testimony favorable to contestants from any disinterested witness. There is no evidence of any progressive mental disease such as senile dementia. Aside from the opinions of Helen Castorf and Ben Rykhoek the testimony for contestants merely shows some impairment of the faculties due to advancing years. That testatrix did not recognize people at times *until they would go close to her and speak* is fairly chargeable to her failing sight. There is no evidence Mrs. Klein ever failed to recognize a relative who spoke to her at close range, that she was ever confused about her property or her relatives, was unable to transact business or ever made a mistake in any transaction.

 The value of a lay witness's opinion of mental unsoundness is measured by the strength of the facts on which it is based. Ipsen v. Ruess, 239 Iowa 1376, 1387, 35 N.W.2d 82, 90, and citations. The opinions of Helen and Ben Rykhoek add little to the matters detailed by them in evidence.

 Testimony as to declarations by Enid designed to show that Mrs. Klein (for the most part the last two months of her life) had delusions as to the morals of Helen, Ben Rykhoek *and Enid herself* was inadmissible. In Iowa and by the overwhelm-

ing weight of authority where, as here, there are two or more beneficiaries whose interests under a will are several, not joint, declarations of one are inadmissible on the issues of mental incapacity or undue influence, to the prejudice of other beneficiaries. In re Estate of Hollis, 234 Iowa 761, 768, 12 N.W.2d 576, 580, and citations; James v. Fairall, 154 Iowa 253, 256, 134 N.W. 608, 38 L. R. A., N. S., 731, and citations; 57 Am. Jur., Wills, section 424; annotation 167 A. L. R. 13, 37.

Upon the trial contestants' counsel conceded the evidence of declarations by Enid was not admissible against anyone but her but contended it was receivable against Enid. However, contestants' attack was upon the entire will and codicil, not merely the devise to Enid in the codicil, and the case was thus submitted to the jury. We are aware of no precedent in this state for the theory that declarations by Enid could be considered against her but ignored as to the other beneficiaries. See Lawless v. Lawless, 156 Iowa 184, 135 N.W. 560; In re Estate of Hollis, supra, 234 Iowa 761, 771, 12 N.W.2d 576, 581, 582; 57 Am. Jur., Wills, section 425; annotation 167 A. L. R. 13, 56–59.

 It is true testatrix did not dispose of her property in the way the statutes of descent would have done had she died intestate. But distribution thought by others to be unequal or even unjust is insufficient basis for a finding of either testamentary incapacity or undue influence. In re Estate of Heller, 233 Iowa 1356, 1365, 11 N.W.2d 586, 591; Zinkula v. Zinkula, 171 Iowa 287, 302, 303, 154 N.W. 158, and citations; 57 Am. Jur., Wills, section 445; annotations 66 A. L. R. 228, 250, 251; 154 A. L. R. 583, 592.

We feel contestants' showing as to mental incapacity is weaker than in these cases in which the evidence was held insufficient: In re Estate of Kirby, 241 Iowa 340, 41 N.W.2d 8; In re Estate of Meyer, 240 Iowa 1226, 37 N.W.2d 265; In re Estate of Hollis, supra, 234 Iowa 761, 12 N.W.2d 576; In re Estate of Sinift, 233 Iowa 800, 10 N.W.2d 550. (Mrs. Hollis and Mrs. Sinift were about the same age as Mrs. Klein.) In each case we approved a verdict directed against contestants at the close of their evidence although there was no testimony for proponent.

III. Contestants' objections to probate of the will and codicil allege undue influence of the husband, Abe, son John,

daughter-in-law Enid, and grandson Earl. The charge as to Earl (who was not over sixteen when the will was made) seems not to be pressed. Contestants say in argument it was perfectly natural for testatrix to give the home farm to Earl who had always lived there. John is a minister in Creston who has not lived in the vicinity of his parents since about 1920. For seven or eight years he lived in Denver and before that for several years in Illinois. There is no evidence John exerted any influence in the making of either will or codicil.

The husband was only a year or two younger than testatrix. Enid and Earl lived with the aged couple. The provisions of the will and codicil in favor of Abe are much less in value than his distributive share in case of intestacy. He had conveyed two of the three farms to his wife. So far as shown Abe's only connection with making the will and codicil was to go to "the other room" and get the will, call Enid when testatrix was uncertain how to sign her name, and inform Mr. Knopf who later witnessed the codicil that "Grandma" was going to change her will. There is evidence, largely opinions of interested witnesses, that Abe was domineering, but it is not shown he exerted influence in the preparation of will or codicil.

It is true Enid summoned the witnesses to the will and codicil and, after Abe called her into the room, told testatrix to sign the will the way her name appeared in it and showed her the line on which to sign. Enid was not a beneficiary under the will although her son, Earl, was. It does not appear that Enid had any part in preparation of the will or codicil.

There is nothing unusual or improper in anything either Abe or Enid is shown to have done in connection with the execution of these instruments.

Testimony of Ben Rykhoek that Mrs. Klein had told him John wanted the 177-acre farm and, with a smile, that Enid had asked her if she was not going to give her (Enid) and her boy (Earl) more than the others because he had always lived with them is not substantive proof of undue influence or of the truth of such statements but is to be considered only as showing testatrix' state of mind. In re Will of Soderland, 239 Iowa 569, 580, 30 N.W.2d 128, 134, and citations; Hansen v. Waugh, 237 Iowa 304, 317, 21 N.W.2d 762, 768, and citations; 57 Am.

Jur., Wills, section 895; 68 C.J., Wills, section 774; annotations 79 A. L. R. 1447, 1449; 148 A. L. R. 1225.

Further, these claimed declarations of testatrix were made many years prior to execution of the will and could have little if any bearing on the matters in issue.

Evidence of statements by testatrix before Carl's death in April 1943 and Marie's death on January 1, 1945, as to her then intention to dispose of her property does not establish undue influence in making the instruments in question. Testatrix had a perfect right to change her mind. In re Will of Diver, 214 Iowa 497, 502, 503, 505, 240 N.W. 622. Not only did Carl and Marie die after it is claimed such declarations were made, but, as stated, Helen Castorf's husband died in November 1945 leaving her property valued at about $40,000. Before the codicil was made Ben and Carl Rykhoek had become involved in a dispute with Mr. and Mrs. Klein over the rent of the 177-acre farm.

■■ It is true, as contestants argue, that undue influence may be proven by circumstantial evidence and that the issue of undue influence cannot be separated from that of testamentary incapacity. However, undue influence must be such as to substitute the will of the person exercising it for that of testator, thereby making the instrument express the intent of such person, not of the testator. It must operate at the very time the will is made and control its making. It is not established by proof of opportunity and disposition to exercise it. Importunity, request and persuasion that do not control the will are not enough. In re Estate of Heller, supra, 233 Iowa 1356, 1367, 11 N.W.2d 586, 592, and citations; In re Estate of Hollis, supra, 234 Iowa 761, 769, 12 N.W.2d 576, 581, and citations; In re Estate of Lochmiller, 238 Iowa 1232, 1235, 1236, 30 N.W.2d 136, 139; 57 Am. Jur., Wills, sections 351 et seq. See also upon the issue of undue influence In re Will of Brooke, 238 Iowa 306, 26 N.W.2d 688; Campbell v. Hale, 233 Iowa 264, 6 N.W.2d 128.

■ We must hold the evidence insufficient to support the finding that either the will or codicil was the result of undue influence.

■ IV. Proponent's motion for directed verdict should have been sustained. His motion, on the same grounds, under rule 243(b), Rules of Civil Procedure, for judgment notwith-

standing verdict was also good. Since it appears that the material facts relating to all issues were fully developed at the trial and in our opinion the ends of justice would not be served by awarding a new trial, the trial court is directed, pursuant to rule 349, to enter judgment for proponent as if one or the other of said motions had been sustained. See Olson v. Hodges, 236 Iowa 612, 627, 628, 19 N.W.2d 676, 684, 685; Kinney v. Larsen, 239 Iowa 494, 500, 31 N.W.2d 635, 638.—Reversed and remanded.

BLISS, C.J., and OLIVER, HALE, WENNERSTRUM, MANTZ, MULRONEY, and HAYS, JJ., concur.